COMBS, JUDGE:
*599 Appellant, F.V. (Father), appeals from Orders of the Fayette Circuit Court terminating his parental rights to his two minor children in these consolidated appeals. After our review, we vacate and remand.
Father and the children's mother had two children, L.J.S.V., a male born on July 26, 2012, and V.M.V., a female born on September 16, 2015. We cite from certified juvenile records made a part of the record below in order to set forth the pertinent background of this case.
On September 23, 2015, the Cabinet filed dependency, neglect, and abuse petitions after V.M.V. tested positive for heroin and codeine at birth. Her mother also tested positive for heroin and admitted that she had been using on a daily basis for more than a year. Father was identified as putative father. He did not attend the September 25, 2015, adjudication hearing at which the mother stipulated to risk of neglect based on drug use during pregnancy. L.J.V.S. was placed with a maternal cousin, and the court ordered paternity testing.
On November 2, 2015, the children were placed in the Cabinet's custody after UK hospital refused to discharge V.M.V. to the cousin due to her inability to provide appropriate care. Both children were placed in a foster home.
A February 3, 2016, a report of a guardian ad litem (GAL) reflects as to the children in foster care: "each have [sic ] their own bed and room in the home.[2] The foster parent works and the children go to daycare...." The caregiver described the children as adjusting well. She described L.J.S.V. "as crying and using the bathroom on himself when he sees his parents. [L.J.S.V.] told the caregiver that he is using the bathroom on himself because he was 'told' if he does so he'll go home." The child sometimes had behavior problems for a few days after visits and was upset when neither parent showed up for a visit. "The caregiver said that the parents are appropriate during the visits." According to the foster parent, neither child was currently having medical problems. L.J.S.V. "did have significant dental issues but those were resolved." The GAL recommended that the parents needed to work their case plans. "To date they have done little to address the drug use[3] , which caused the children to be removed."
A review by the Cabinet on February 8, 2016, reflected that Father had not completed any case plan. The children were taken for DNA testing on January 21, 2016. Results were pending. V.M.V. had fewer withdrawal symptoms. When L.J.S.V. entered care, he was taken for a dental appointment. He had multiple cavities and possibly needed dental surgery. Parents were compliant with biweekly visitation *600 -- except for two missed visits. The Cabinet recommended that the children should remain in custody with the goal to return to parent.
On February 8, 2016, the court entered an order that the children remain with the Cabinet after having found that the parents were not working case plans and were missing visits. The next hearing was scheduled for May 9, 2016.
On February 16, 2016, Father was arrested on an outstanding DUI warrant while riding as a passenger in the mother's car. As a non-citizen from Guatemala, he was transferred to the custody of Immigration Control and Enforcement (ICE) and was detained until December 20, 2016.
A report of the Fayette Foster Review Board dated May 3, 2016, noted that Father was in the Boone County jail and might be deported; additionally, the report provided:
Judge stated that additional services needed to be offered to family, but I feel reunification is remote with a heroin addicted mom & deported father. Offer services, but don't hesitate to move quickly to TPR & adoption if plan is not followed.
According to the review by the Cabinet of May 9, 2016, Mother reported that she and Father had been stopped by police for a loud muffler, that Father was in the Boone County jail, and that he might be deported to Guatemala. The Cabinet had had no contact with Mother since February 22, 2016. The report further reflected that "[o]n 4/18/16, SSW[4] attempted to contact Officer James Bug with immigration to receive an update on the status of [Father] but he has not returned my phone call."[5] .
Paternity test results received on February 18, 2016, established Father as the biological father. Father's last visit with the children occurred on February 9, 2016. V.M.V. was meeting developmental milestones. L.J.S.V. underwent oral surgery on May 2, 2016, and recovered well. The recommendation was that the children remain in the Cabinet's custody.
On May 9, 2016, the court ordered that the children remain with the Cabinet, finding that: "Parents aren't working their case plans; Cabinet is pre-perming for goal change."
The Cabinet's next review was dated June 13, 2016. According to the mother, Father "was shipped to Chicago for a month then to Guatemala. She said his next immigration court date is in July." The Cabinet recommended a goal change to adoption. On June 13, 2016, the court conducted an annual permanency hearing and ordered that the permanency plan should be adoption.
On July 11, 2016, the Cabinet filed petitions for termination of parental rights as to each child. On August 15, 2016, the Cabinet's counsel filed an affidavit for appointment of a warning order attorney, stating that Father had been located at the McHenry County Jail in Woodstock, Illinois, reportedly on an immigration detainer. On September 30, 2016, the warning order attorney filed a report that he had received a response from Father, who unequivocally and adamantly challenged any attempt to terminate his parental rights.
On October 25, 2016, the United States Immigration Court entered a decision in Father's favor in the removal proceeding. Father, pro se , had appeared and prosecuted the matter successfully. It found *601 that Father, a citizen of Guatemala, was taken into custody in February 2016. He had a history of DUI convictions. It was not disputed that Father spent a total of 25 days in jail for all of the DUI's combined. While incarcerated, he attended Alcoholics Anonymous (AA) meetings. The court concluded Father was eligible for cancellation of removal. It found, inter alia, that he had not been convicted of an offense that would bar cancellation of removal. The court was convinced that he would continue to rehabilitate himself from dependence on alcohol.
In December 2016, Father was released from detention as outlined more fully below in the testimony presented at trial. He immediately sought visitation with the children, which was not allowed. In March 2017, Father's counsel filed a motion requesting visitation. The motion was denied.
Trial began on May 30, 2017. Father appeared and was represented by counsel. Mother did not appear, and her counsel was granted permission to withdraw. The GAL appeared on the children's behalf. The court noted that Father had been compliant in taking alcohol and drug assessment classes in a positive effort at rehabilitation.
Karen Callahan, the investigative worker, testified. She became involved after V.M.V. tested positive for heroin and codeine at birth. Ms. Callahan identified each child's birth certificate and testified that no father was listed. The mother related that Father was a boyfriend; she was not really sure he was the father because they did not live together. After the mother named him as the possible father, Callahan spoke to him. According to Callahan, Father believed that he was the children's father, but he also was not sure. He did not know about the mother's drug use because he did not have regular contact with them. Father saw L.J.S.V.-- but not on any regular schedule.
Keisha Williams, ongoing social worker since 2015, testified. The children came into the Cabinet's custody on November 2, 2015. Initial case planning took place on November 18, 2015. Father's case plan required him to undergo substance abuse and parenting assessments and to follow all recommendations; to drug screen; to obtain and to maintain stable housing and employment; and to participate in supervised bi-weekly visits. Initially, Father stated that he was not going to work the case plan until DNA was established. He did not undergo drug screening. Ms. Williams testified that the parents were not consistent with visits. However, the Cabinet's review of February 8, 2016, reflects that the children's mother and Father were compliant with visitation -- except for two missed visits.
On February 16, 2016, Ms. Williams received a phone call from Mother and learned that Father had been incarcerated at Boone County jail and that at some point was transferred to Chicago on an ICE detainer. Ms. Williams contacted Boone County jail, and they gave her contact information for the immigration officer, James Bugg. Ms. Williams testified that she tried to contact Mr. Bugg numerous times without success. He left her a voice message on one occasion.
The permanency goal was changed on June 15, 2016. There had been no movement in the case. At that time, Ms. Williams only knew that Father was being held somewhere in Illinois. On August 11, 2016, Ms. Williams received a voice mail from the deportation officer, Mr. Arrias, reporting that Father was in the McHenry County Jail in Illinois on an ICE detainer under a different name.
Ms. Williams had no contact with Father until December 21, 2016, the day after he *602 was released from jail -- the same day that he contacted her. On January 5, 2017, they negotiated a new case plan which required Father: to cooperate with the Cabinet; to drug screen; to complete a substance abuse assessment and to follow all recommendations; and to participate in in-home services when or if appropriate. Father did not begin drug screening until April 4, 2017, because he had not had an I.D. (On March 21, 2017, the court entered an order allowing Father to use a Guatemalan photo I.D. for drug testing). Since then, his weekly drug screens have all been negative. When Ms. Williams last spoke with Father, he was living with his brother in Georgetown. The brother had been denied potential placement due to some criminal history or arrests, but Ms. Williams did not know what they were. Father had since contacted Ms. Williams, but he did not provide any specifics about progress and only asked her about visits with his children. Father provided a certificate that he completed parenting classes while incarcerated.
Ms. Williams's concerns about Father's ability to parent the children included his criminal history and use of aliases; the fact that he did not initially drug screen because he said he did not have an I.D. -- although past criminal records appear to indicate that he had provided some sort of identification number; Father's failure to recognize L.J.S.V.'s dental needs; the fact that Father did not appear to be consistent in L.J.S.V.'s life and was not paying any type of child support; and the fact that Father denied any knowledge of the mother's drug use while nonetheless having "consistent contact or a consistent relationship with his son." In addition, Ms. Williams could not verify Father's income because he still had not provided documentation from his employer.
Ms. Williams testified that the children are doing wonderfully well in foster care. V.M.V. is developmentally "on target." L.S.J.V. "hopefully" will be starting preschool soon; his speech and dental health have improved. The children have bonded with the foster family. Ms. Williams believes that termination of parental rights would be in the children's best interests based on the length of time that the case has been open with limited or no progress toward reunification. V.M.V. has been in foster care her entire life and they would have concerns that she has no relationship with Father and that L.S.J.V. has not seen Father in 15 months.
On cross-examination, Ms. Williams testified that she received the paternity results on February 18, 2016. At that time, Ms. Williams only knew that Father had been incarcerated in the Boone County jail. She did not send Father a letter because she did not believe she was required to do so if a parent were in jail and that she did not know if she could communicate where an ICE detainer was involved. Ms. Williams never spoke to Mr. Bugg or Officer Arrias directly. When asked about her November 22, 2016, report that Father would likely be deported to Guatemala, Ms. Williams testified that she based her report on the information (previously) furnished by the children's mother. Asked why she did not contact Father, Ms. Williams responded, "I do not know how to answer that, I apologize." (Parenthetically but significantly, a favorable decision had been rendered in Father's immigration case on October 25, 2016.)
The foster mother, A.M., also testified. When the children came into her home on November 2, 2015, V.M.V. was six weeks old and L.J.S.V. was three years of age. L.J.S.V. recognized Father and would talk about him. A.M. believed that L.J.S.V. "absolutely" had a relationship with Father.
*603 She did not know why the visits stopped. At the time of the trial, both children were doing well.
The foster mother further testified that seven children live in her home -- L.J.S.V. and V.M.V.; her two biological daughters, ages 18 and 14; a grandson; an adopted daughter; and another foster child, who is four months of age.[6] L.J.S.V. and V.M.V. share a room with the adopted daughter. L.J.S.V. is getting ready to start kindergarten and will ride the bus with the grandson. L.J.S.V. and V.M.V. have bonded with her family, and her home is an adoptive home.
Bryan Bennett, who had been Father's immigration attorney in the government's pending appeal, testified. He explained that Father would have had to disclose a criminal history and that the government would have performed an FBI records check. Bennett opined that Father will likely succeed on appeal. If so, he will be issued a green card which is renewable every ten years. After five years, he could apply for citizenship and will be able to obtain a Social Security card and apply for a driver's license. The court asked about accuracy of Father's criminal record due to his aliases. Mr. Bennett explained that the aliases made no difference because the government attorneys use a fingerprint search.
The trial resumed on July 28, 2016. Father testified through an interpreter that he has never done drugs, nor did he suspect that Mother had. L.S.J.V. did not test positive for drugs at birth. Before his involvement with the Cabinet, Father worked for MNO Construction, earning about $180.00 per day and working 50-55 hours a week.
Father admitted having been arrested three or four times for DUI. He did not recall the dates. He was also arrested for public intoxication. The children were not present on any of these occasions. He was not arrested while caring for the children. Father acknowledged his problems with alcohol in the past, but testified that he has not touched alcohol in more than a year. Father has never been arrested for using or possessing a controlled substance or for any violent criminal acts.
Father was detained around February 16, 2016, after the "female" with whom he was driving was stopped. He spent over three and one-half months in the Boone County Jail. Father tried to call Keisha Williams, but he could not leave a message from the jail phone. After that Father was sent to the McHenry County jail near Chicago. No one from the Department for Community Based Services (DCBS) (child welfare services) or any social worker contacted him at either facility. Father contacted immigration for assistance, and the officer, Ricardo Arrias, said that he would contact DCBS for him.
Meanwhile, Father worked on his case plan during his detention. He put his time in incarceration to positive use. He took parenting classes at McHenry County and received a certificate of completion dated October 2, 2016. He also attended AA meetings, Bible study, and English classes while in detention. Father was released on December 20, 2016. He called Keisha Williams on December 20 or 21, 2016, and told her that he wanted to fight his children's case; he also informed her about the classes he had taken while in detention. Father thought that he had given her a copy of his certificates. On January 30, 2017, Father underwent a drug and alcohol assessment by Dr. Carrillo, who saw him for assessment per the case plan that Keisha Williams had given him in January *604 2017. Dr. Carrillo's written report reflected a recommendation of "None," meaning that no classes were required. However, that recommendation was erroneous, and classes were recommended. Father is currently taking those classes.
Father works for the same company as he did before. He has been there for about five years. He now he earns $120.00 per day as an employee. He works full-time, Monday through Friday, sometimes on Saturday. He is now living in a new house with three rooms and enough beds. Father contacted DCBS about his new home, but they have not come out to inspect. He is in the process of getting back to his prior higher earnings. Father will hire someone to help him care for the children when he is working. Father had not found out the cost of child (day) care, but he testified that a domestic would cost about $250.00 per week. Father is not in a relationship with Mother and has no contact with her.
Father admitted his past mistakes and that he was embarrassed by them. He decided to change for his children and for himself. Father has not seen the children since February 2016. When he was released from detention, he immediately asked the Cabinet to set up visitation, but it declined to do so, saying that the court had to decide.
On cross-examination, Father testified that L.J.S.V. was born in July 2012. Father moved in with Mother after L.J.S.V. was born, but he was not present all the time. He had another address. Mother had a hot temper, and when she would start yelling, he would go back to the other address, leaving L.J.S.V. with her. Father could not explain why the child had untreated dental issues when he entered into foster care. Father did not think that L.S.J.V. was old enough to be signed up for preschool when he was three. Father had no idea that Mother was using drugs while she was pregnant with V.M.V.
Father said that he did not attend court hearings before he was detained because he was afraid of being arrested by immigration authorities. He did not work on his case plan before he was detained. He was still drinking at that time. When the children were removed, he went into depression. Father had not paid child support. After he was released, Father went to drug screening, but he was told that his I.D. was not valid. He was asked for a Social Security card, but he did not have one.
Father was asked if he had sent a card or gift for L.J.S.V.'s most recent birthday. He explained that he did not have the address. If he had known, he could have sent letters and gifts, and he testified that he would have done so.
The trial concluded on August 2, 2017, after which the court announced its decision to terminate parental rights. On August 21, 2017, the court entered written findings of fact and conclusions of law and orders terminating parental rights and orders of judgment as to each child.
The court found that each child was previously adjudged to be an abused or neglected child by the Fayette Family Court. Additionally, it found that each child is abused or neglected as defined in KRS[7] 600.020. The court found that termination of parental rights would be in the interest of each of the children based on the following criteria:
(1) Prior to the filing of this petition, reasonable efforts have been made by the Cabinet to reunite this child with his [or her] parents but those efforts have been unsuccessful. [The child's mother] and Father refused *605 to engage in services when initially given case plans. The Cabinet made multiple attempts to locate [Father] after he was arrested but because he used different aliases, he was unable to be found.
(2) The Cabinet ... has offered or provided all reasonable services to the family including case planning, referrals to community partner, no-cost drug screening, home visits and supervised visitation services.
(3) Despite the availability of these services, the Respondent parents have failed or refused or has [sic] been unable to make sufficient effort and adjustments in their circumstances, conduct or conditions to make it in the best interest to return [each child] to their home within a reasonable period of time, considering the child's age.
In addition, the court found that the children are currently placed together in an adoptive home with their half-sister, that each child is thriving, has bonded to the foster family, and that it is expected that each child will continue to improve with a permanent adoptive placement.
The court further found that the following grounds exist for termination of the parental rights pursuant to KRS 625.090(2), in relevant part, as follows:
(2) For periods of not less than six months, [the children's mother] and [Father] have failed or refused to provide or have been substantially incapable of providing essential parental care and protection, and there is no reasonable expectation of improvement in parental care and protection, considering the age of the child. Testimony established that when the Cabinet became involved, [Father] was engaging in a pattern of alcohol abuse and criminal activity.... Both parents refused to work a case plan. [Father] specifically refused to work with services offered in order to avoid law enforcement and DCBS. [Father] was then incarcerated for ten months....
(3) For reasons other than poverty alone, [the children's mother] and [Father] have failed to provide or have been incapable of providing essential food, clothing, shelter, medical care, or education necessary and available for [each] child's well-being, and there is no reasonable expectation of significant improvement in the immediately foreseeable future, considering the age of the child. Testimony established that when the Cabinet became involved, [Father] was engaging in a pattern of alcohol abuse and criminal activity.... Both parents refused to work a case plan. [Father] specifically refused to work with services offered in order to avoid law enforcement and DCBS. [Father] was then incarcerated for ten months and Ms. Baker ceased contact with her worker and the children. Testimony established that [L.J.S.V.] had serious dental health needs that were neglected until he came into foster care which required corrective surgery. He also had no immunizations and was not enrolled in any preschool program. [Father] also testified that he has never paid child support, even before the removal. Despite his recent progress, [Father] would need at least a year to become stable and become reacquired [sic] with the children, who[m] he has not seen since February 2016. Moreover, he was unable to articulate a plan to this Court on how he would parent two small children other than to hire a maid. Due to substance abuse and criminal activity, these parents were unable to care for their children and there is no reasonable expectation that either parent will improve *606 given the lack of reunification effort made since the children's removal in November 2015.
Father appealed this ruling.
The Fourteenth Amendment provides in relevant part that no State shall "deprive any person of life, liberty, or property, without due process of law[.]" The "Due Process Clause applies to all 'persons' within the United States, including aliens , whether their presence here is lawful, unlawful, temporary, or permanent...." Zadvydas v. Davis , 533 U.S. 678, 693, 121 S.Ct. 2491, 2500, 150 L.Ed.2d 653 (2001). (Emphasis added). As this Court stated in R.P., Jr. v. T.A.C., 469 S.W.3d 425, 426-27 (Ky. App. 2015) :
[P]arental rights are a "fundamental liberty interest protected by the Fourteenth Amendment" of the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982).
When the government acts to terminate a parent's rights, it is not merely infringing on those rights; it is ending them. Lassiter v. Dept. of Social Svcs. of Durham Co., N.C., 452 U.S. 18, 27, 101 S.Ct. 2153, 2160, 68 L.Ed.2d 640 (1981).
Accordingly, termination of parental rights is a grave action which the courts must conduct with "utmost caution." M.E.C. v. Commonwealth, Cab. for Health and Family Svcs., 254 S.W.3d 846, 850 (Ky. App. 2008). Termination can be analogized as capital punishment of the family unit because it is "so severe and irreversible." Santosky v. Kramer, 455 U.S. at 759, 102 S.Ct. at 1398. Therefore, to pass constitutional muster, the evidence supporting termination must be clear and convincing. 455 U.S. at 769-70, 102 S.Ct. at 1403. Clear and convincing proof is that "of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent minded people." Rowland v. Holt, 253 Ky. 718, 70 S.W.2d 5, 9 (Ky. 1934).
In Cabinet for Health and Family Services v. K.H. , 423 S.W.3d 204, 209 (Ky. 2014), our Supreme Court explained as follows:
The Commonwealth's TPR [termination of parental rights] statute, found in KRS 625.090, attempts to ensure that parents receive the appropriate amount of due process protections. KRS 625.090 provides for a tripartite test which allows for parental rights to be involuntarily terminated only upon a finding, based on clear and convincing evidence, that the following three prongs are satisfied: (1) the child is found or has been adjudged to be an abused or neglected child as defined in KRS 600.020(1) ; (2) termination of the parent's rights is in the child's best interests; and (3) at least one of the termination grounds enumerated in KRS 625.090(2)(a)-(j) exists.
Indeed, "the bulk of the statute, reflects a default preference against termination, which is why it states that no termination of parental rights shall be ordered unless the court makes the statutory findings based on the higher standard of proof of clear and convincing evidence." D.G.R. v. Commonwealth, Cabinet for Health and Family Services , 364 S.W.3d 106, 112-13 (Ky. 2012).
Father focuses on the third prong of the test as the basis for his appeal. He contends that there is not clear and convincing evidence of one or more of the grounds under KRS 625.090(2), that the court's findings are inconsistent with the evidence, and that they are inadequate to terminate his parental rights. First, we examine the statute.
KRS 625.090(2) provides that: "No termination of parental rights shall be ordered *607 unless the Circuit Court also finds by clear and convincing evidence the existence of one (1) or more of the following grounds[.]" Here, the court found two grounds - subsections (e) and (g):
(e) That the parent, for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child and that there is no reasonable expectation of improvement in parental care and protection, considering the age of the child;
...
(g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child[.]
Those two grounds - unlike the other subsections of KRS 342.090(2) - also require clear and convincing evidence that "there is no reasonable expectation" of improvement. As noted above, the court made the same findings in support of both subsections, namely that:
Testimony established that when the Cabinet became involved, [Father] was engaging in a pattern of alcohol abuse and criminal activity.... Both parents refused to work a case plan. [Father] specifically refused to work with services offered in order to avoid law enforcement and DCBS. [Father] was then incarcerated for ten months.... Testimony established that [L.J.S.V.] had serious dental health needs that were neglected until he came into foster care which required corrective surgery. He also had no immunizations and was not enrolled in any preschool. [Father] testified that he has never paid child support, even before the removal. Despite his recent progress, [Father] would need at least a year to become stable and become reacquired [sic] with the children, who[m] he has not seen since February 2016. Moreover, he was unable to articulate a plan to this Court on how he would parent two small children other than to hire a maid. Due to substance abuse and criminal activity, these parents were unable to care for their children and there is no reasonable expectation that either parent will improve given the lack of reunification effort made since the children's removal in November 2015.
First of all, the Cabinet became involved because of the mother's drug abuse. The children were removed after V.M.V. testified positive for heroin and codeine at birth -- not because Father had a history of alcohol-related offenses. Although Father did not initially work his case plan,[8] we cannot agree that there is no reasonable expectation of improvement "given the lack of reunification effort." Indeed, the evidence established the contrary of the court's findings.
After he was detained, Father attended AA classes, completed parenting classes, and attended English classes and Bible classes. He attempted to contact the Cabinet while he was detained and also requested assistance from an immigration officer in doing so. Father immediately responded to the Warning Order Attorney *608 "unequivocally" challenging any attempt to terminate his parental rights, a position which he has consistently maintained throughout these proceedings. Pro se, Father prevailed in his immigration case -- no small feat.
Immediately upon his release from detention, Father contacted Keisha Williams. He promptly met with her to establish a new case plan. Father has made repeated requests for visitation with his children since his release from detention. Father attended the substance abuse assessment with Dr. Carrillo, and at the time of trial, he was attending classes as recommended. It was stipulated that any delay in completing those classes cannot be considered because it was caused by Dr. Carrillo's error. Father's testimony that he has not touched alcohol for more than a year is unrebutted. Father's weekly drug screens are negative; he has full-time employment; he has obtained new housing; and he can now afford to hire someone to watch his children while he is at work.
Father submits that his case is similar to M.E.C. v. Commonwealth., Cabinet for Health and Family Services, 254 S.W.3d 846 (Ky. App. 2008). We agree. In M.E.C., the children were removed by an emergency custody order. M.E.C.'s case plan included supervised visits, which she attended until she was incarcerated for a short time. A month later, she was hospitalized for an extended period of time. This court held as follows:
[R]easonable services to reunite the family were not provided to M.E.C. and her children. The goal from reunification to termination was changed after only eight months time, of which M.E.C. was either incarcerated or hospitalized. The Cabinet never changed its plan for reunification to accommodate M.E.C. during this time. In addition, the Cabinet never provided any rationale for changing the goal.
[W]e find no substantial evidence in the record to support a finding that there is no reasonable expectation of improvement in M.E.C.'s situation. At the conclusion of the trial, M.E.C. was in a substance abuse treatment center, had a full-time job, acquired parenting classes for herself, and had resolved most of her legal issues. She argued that the court failed to acknowledge the improvements she had made in her lifestyle ... and had instead based its decision solely on her past conduct. We agree.... [T]he statute has no requirement that the parent completely eradicate all problems immediately.
Id. at 854-55. (Emphasis added).
In the case before us, the Cabinet filed petitions to terminate parental rights in July 2016, only eight months after the children were placed in foster care. At that time, Father was in detention, and the Cabinet thought that he was going to be deported. Father's aliases may have impeded the Cabinet's efforts to locate him early on. However, in August 2016, Mr. Arrias left a message for Keisha Williams advising her that Father was in the McHenry County Jail. Nonetheless, Ms. Williams did not contact him, nor did she ever speak to Mr. Arrias.
Just like the mother in M.E.C ., Father has demonstrated significant improvements. Although the court stated that Father would need at least a year to become stable and reacquainted with his children, that assessment does not appear to be a finding based upon the evidence. Rather, it appears to be based upon a statement made by the court at the end of the hearing. After closing arguments, the court indicated that if Father were given the opportunity to work a case plan starting right now, it would take him a year because *609 the court would require him to have drug and alcohol treatment, a long time of sobriety, and very comprehensive parenting classes.
As we noted in M.E.C. , the statute does not require that the parent completely eradicate all problems immediately. But it does require that the Cabinet prove by clear and convincing evidence that there is no reasonable expectation of improvement. It has utterly failed to do so in this case.
We do not consider the failure to enroll L.J.S.V. in preschool when he was three years old sufficient to support a finding under KRS 625.090(2)(e) or (g). There is no requirement that a child be enrolled in school at that age.
Father's failure to pay child support before paternity was established is insufficient to support a finding under KRS 625.090(2)(e) or (g). The statute provides in relevant part that:
(g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child[.]
However, as Father notes in his brief, nothing was ever set up with the County Attorney for Father to pay child support. See J.A.T. v. Cabinet for Health and Family Services , 2014-CA-000969-ME, 2014 WL 7339021, at *4 (Ky. App. Dec. 24, 2014) ("Until Father's paternity was established, he was under no obligation, and ... could not be ordered, to pay support for Child. Therefore, the court's finding that Father did not financially provide for Child in support of its determination of abandonment constituting abuse or neglect is clearly erroneous."); See also G.S.B. v. B.T.R. , 2002-CA-002319-MR, 2003 WL 22928039, at *5 (Ky. App. Dec. 12, 2003) (Clear and convincing evidence did not support finding under KRS 199.502(1)(g) where father was not under any court order to pay child support, and could not have been convicted of misdemeanor nonsupport as paternity was never established until he filed motion to do so in adoption action).
Father had stated that he would hire a maid or someone to care for the children while he was at work. It appears that the court erroneously construed that response as constituting the entirety of his plan to parent them. We agree with Father that providing for childcare in one's home seems to be a fairly reasonable solution for a working parent. It certainly cannot support a finding under KRS 625.090(2)(e) or (g) in this case.
Therefore, we vacate the judgments of the Fayette Circuit Court terminating Father's parental rights. As we explained in M.E.C. , we are not ordering the children's immediate return, "but rather, hold that the Cabinet failed to meet its burden to establish grounds for termination." Id. at 855. We do not know Father's current situation or the outcome of his immigration appeal. "If the Cabinet believes that it has sufficient grounds, now, to seek termination it is certainly within its authority to pursue the statutory procedure. Otherwise, all necessary statutory services should be rendered to help this family." Id.
ALL CONCUR.

As set forth below, the foster mother testified that L.J.S.V. and V.M.V. share a room with a third child.

The children were removed because of the mother's drug use.

Social Services Worker.

According to this Review, two months passed before the Cabinet tried to contact immigration officials about Father.

This foster child is Mother's new baby apparently by a different father.

Kentucky Revised Statutes.

Father did attend supervised visitation until he was detained -- except for two missed visits. According to Keisha Williams, supervised visitation was part of the initial case plan.