RENDERED: NOVEMBER 8, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky
# Court of Appeals

NO. 2024-CA-0261-ME

C.G.                                                                                    APPELLANT

v.

APPEAL FROM JACKSON FAMILY COURT
HONORABLE CLINT J. HARRIS, JUDGE
ACTION NO. 23-AD-00001

CABINET FOR HEALTH AND
FAMILY SERVICES; K.M.W.G.,
A CHILD; AND M.G.                                                     APPELLEES

AND

NO. 2024-CA-0262-ME

C.G.                                                                                    APPELLANT

v.

APPEAL FROM JACKSON FAMILY COURT
HONORABLE CLINT J. HARRIS, JUDGE
ACTION NO. 23-AD-00002

CABINET FOR HEALTH AND
FAMILY SERVICES; K.S.I.G.,
A CHILD; AND M.G.                                                     APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, A. JONES, AND TAYLOR, JUDGES.

CALDWELL, JUDGE: C.G. ("Mother") appeals from the involuntary termination of her parental rights to her minor children, K.M.W.G. ("Son") and K.S.I.G. ("Daughter).[1]  We affirm.

**FACTS**

Son was born in late 2008.  Daughter was born in early 2015.  The Cabinet for Health and Family Resources ("the Cabinet") became involved with the family in 2015 and provided family protection services partly due to Daughter's medical needs.  Daughter was born with spina bifida and has significant anomalies in her urinary and gastro-intestinal systems.

In late 2018, the Cabinet filed a dependency, neglect, and abuse ("DNA") petition against Mother and M.G. ("Father") on Son's behalf.  The Cabinet alleged neglect due to Son's frequent unexcused absences from school.  The children were not removed from the home at that time.

---

[1] To protect the privacy of the minor children, we do not refer to the children or to their natural parents by name.  *See also* Rules of Appellate Procedure ("RAP") 5(B)(2) ("Initials or a descriptive term must be used instead of a name in cases involving juveniles, allegations of abuse and neglect, termination of parental rights, mental health, and expungements.").

-2-

The Cabinet filed another DNA petition on both children's behalf in the spring of 2021. The Cabinet had become involved with the family again after Father shot a man in Daughter's presence. Father was then incarcerated.

The 2021 DNA petition stated Mother was under the influence when contacted by a Cabinet worker and Mother admitted to struggling with substance abuse for the past twenty years. The petition also stated Son again had excessive unexcused absences from school. The petition also expressed concerns about Mother's ability to supervise the children and to provide the proper care for Daughter's medical needs.

The Cabinet established a safety plan requiring that Mother be continually supervised while in the children's presence. The children were placed in the temporary custody of Mother's sister. However, social workers found the children alone with Mother during a random home visit in early June 2021. Mother's sister said she could no longer keep the children. And Mother admitted to substance use while being the only adult present in the home with the children.

The children were placed in foster care on June 8, 2021. Shortly thereafter, Daughter was evaluated at the University of Kentucky Medical Center and classified as medically complex. During Daughter's stay at the hospital, a hair follicle test was conducted. She tested positive for methamphetamine exposure.

An August 2021 Cabinet report stated Mother had been complying with her case plan requirements except that she had positive screens for unprescribed drugs. In September 2021, the children were committed to the Cabinet. Documents in the record indicate Mother was working her case plan that fall. However, Mother did not attend a December 2021 case plan conference.

By early 2022, Mother had completed intensive outpatient treatment (IOP) at New Hope Counseling and Recovery ("New Hope"). Mother did not complete the aftercare program at New Hope, which entailed calling in for random drug screens. But Mother said she would participate in services with another provider. Mother reported having health issues and stated her home was not ready for the children, but she was trying to find a place to live with the children.

Mother signed a case plan in April 2022, agreeing to attend aftercare at New Hope, to attend parenting classes, to maintain a stable home and employment, and to call the Cabinet office each weekday to see if she should drug screen. However, a June 2022 Cabinet report stated Mother failed to call in for drug screens even once as of that date. The Cabinet also noted Mother reported her truck had been impounded and water pipes had burst at her home.

The June 2022 Cabinet report stated Mother had missed all visits with the children for the prior month. It also took note Mother attended IOP but not

aftercare. In late June 2022, the family court entered permanency orders reflecting that the goal remained return to parents.

In early October 2022, the family court entered a permanency review order stating the parents were not making efforts to reunify. In late October, Mother entered treatment at Recovery Works. However, when the social worker called the facility in early November 2022, Mother had already left it. Mother and the social worker negotiated a case plan a few weeks later. This case plan required Mother to complete services at Second Mile, to learn to deal with Daughter's catheter, to attend parenting classes, to find stable housing and employment, and to call the Cabinet on weekdays to see if she should drug test within the hour.

In mid-January 2023, the Cabinet filed petitions for termination of parental rights of Mother and Father on both children's behalf. The petitions alleged the parents failed to provide essential parental care and protection, the parents failed to provide necessities for reasons other than poverty alone, and the children had been in foster care for more than 15 cumulative months of the 48-month period preceding the filing of the petitions.

A late January 2023 permanency order in the DNA case file reflected that the goal had been changed to adoption and states: "order in-home drug testing for Mother." In April 2023, the Cabinet filed a report stating Mother was then living in a sober living home in Williamsburg and working in Corbin. In late April

2023, the family court indicated in its court review notes that Mother was sober. However, Mother did not complete the sober living program.

In July 2023, a case plan was filed in the record stating Mother had been notified of the case planning conference but had failed to attend it. A July 2023 permanency hearing order said both parents would not work a plan. However, Mother began participating in services at Second Mile in August 2023. She also started working at a full-time job in September 2023.

By October 2023, Mother was living at her mother's house along with her mother and her sister and her sister's children. Mother's mother ("Grandmother") also had a history of substance abuse and legal issues, at one time resulting in her incarceration. And Mother's sister was the same person with whom the children's relative placement had failed.

In October 2023, the Cabinet reported Mother had been taking part in services offered by Second Mile, but Mother had not submitted to any drug screens since the last case plan. It also reported that the social worker had visited the home but was not allowed inside to inspect it. The goal remained adoption.

The family court entered orders in the DNA proceeding in October 2023, reflecting that a petition for termination had been filed and that the children remained committed to the Cabinet. However, these orders also stated that Mother was working her case plan.

In November 2023, Mother filed an affidavit of indigency, and counsel was appointed to represent her in the termination proceeding. In December 2023, her attorney filed an answer on her behalf stating Mother had been drug-free for two years, her house had been trashed by other people, and she was considering better residences for the children. The termination proceeding was set for trial on January 30, 2024.

At trial, the Cabinet's proof included the testimony of Cabinet social worker Bobbye McClain, a surgeon who treated Daughter, and the children's foster mother. The surgeon and foster mother testified about the medical tasks needed to provide proper care for Daughter – including catheter care and performing a daily flush of her colon.

Mother called as witnesses her current case manager at Second Mile (Jennifer Wilson), Grandmother, and herself. Mother testified she was now sober, and she was employed full-time, although she had recently switched jobs. She testified that her work schedule sometimes interfered with her attending visitation or calling in for drug screens. She testified she recently submitted to drug screens at Second Mile, but the drug screens apparently were not reported to the Cabinet.

On cross-examination, Mother admitted she never completed a case plan and never let social worker McClain inspect her residence. Mother also admitted she never obtained training to perform the necessary tasks for dealing

with Daughter's complex medical needs.  Mother stated that specialized training for Daughter's medical needs had not been offered to her.

At the conclusion of trial, the family court judge orally stated that the statutory requirements for termination of parental rights had been met.  A couple of weeks after the trial, the family court entered orders terminating both parents' parental rights to both children along with supporting findings of fact and conclusions of law consistent with the oral findings.

Mother filed a timely appeal.  Father did not appeal.  Further facts will be provided as we discuss Mother's arguments.

## ANALYSIS

### Statutory Requirements for Involuntary Termination of Parental Rights

Before terminating parental rights, the family court must find clear and convincing evidence[2] to support each of three parts of the standard established by KRS[3] 625.090.  First, the child must have been found to be an "abused or neglected" child as defined by KRS 600.020(1).  KRS 625.090(1)(a).  Second, the family court must find at least one ground of parental unfitness as set forth in KRS

---

[2] *Clear and convincing evidence* "does not necessarily mean uncontradicted proof.  It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people."  *Commonwealth, Cabinet for Health and Family Services v. T.N.H.*, 302 S.W.3d 658, 663 (Ky. 2010) (internal quotation marks and citations omitted).

[3] Kentucky Revised Statutes.

625.090(2). Third, termination must be in the child's best interest. KRS

625.090(1)(c). In determining the child's best interest and whether there are

ground(s) of parental unfitness, the family court must consider the factors listed in

KRS 625.090(3).

**Standard of Review of Involuntary Termination of Parental Rights**

"[T]ermination of parental rights is a grave action which the courts

must conduct with utmost caution." *M.S.S. v. J.E.B.*, 638 S.W.3d 354, 359 (Ky.

2022) (internal quotation marks and footnote omitted). Thus, the evidence to

support termination must be clear and convincing. KRS 625.090; *see also*

*Santosky v. Kramer*, 455 U.S. 745, 769-70, 102 S. Ct. 1388, 1403, 71 L. Ed. 2d

599 (1982) (holding due process requires proof by at least clear and convincing

evidence for termination of parental rights).

Even so, the decision of a family court to involuntarily terminate

parental rights is accorded great deference on appellate review. We review the

family court's factual findings under the "clearly erroneous" standard of CR[4]

52.01,[5] meaning they shall not be disturbed unless they are not supported by

substantial evidence. *M.P.S. v. Cabinet for Human Resources*, 979 S.W.2d 114,

---

[4] Kentucky Rules of Civil Procedure.

[5] CR 52.01 governs "all actions tried upon the facts without a jury" and provides in pertinent part: "Findings of fact, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."

116 (Ky. App. 1998). We review the family court's determination that termination of parental rights is in a child's best interest for abuse of discretion. *D.J.D. v. Cabinet for Health and Family Services*, 350 S.W.3d 833, 837 (Ky. App. 2011).

With these standards in mind, we consider the arguments raised by Mother on appeal. Mother argues: 1) the Cabinet failed to make reasonable efforts for reunification, 2) there was a reasonable expectation of improvement, 3) the family court failed to consider Mother's indigency in making its findings, and 4) Mother's trial counsel rendered ineffective assistance, so that she was deprived of due process.

After careful review of the record and applicable law, we discern no reversible error and must affirm.[6]

---

[6] By separate order entered this same date, we also grant Mother's motion for an extension of time to file her reply brief and we deny the Cabinet's motion to strike the tendered reply brief. In addition to considering Mother's reply brief, we elect not to impose any sanctions despite the lack of full compliance with all briefing rules in our Rules of Appellate Procedure – such as the lack of explicit preservation statement at the beginning of Mother's appellant brief argument. *See* RAP 32(A)(4). Nonetheless, we conclude that Mother is not entitled to relief on appeal given the generally applicable standard of review for termination of parental rights and the record before us. For future reference, we direct counsel's attention to the appellate briefing resources available on our court website – including appellate briefing checklists and the basic appellate handbook. Court of Appeals - Kentucky Court of Justice (kycourts.gov). (Last accessed October 11, 2024).

On a related note, we appreciate that the record for the DNA proceeding was included in the bound, paginated record for the termination proceeding rather than being submitted to us in a loose, unpaginated manner as often occurs in these types of cases. However, the bound volumes containing the DNA case records greatly exceed the 150-page limit per bound volume stated in RAP 26(B)(1) – thus, resulting in strain to and loosening of the binding. To best assure that the written record remains intact, we remind clerk's offices to please limit each volume of a bound record to no more than 150 pages.

**Reasonable Efforts Argument**

Mother argues the Cabinet failed to make reasonable efforts to reunify her with her children. *See* KRS 625.090(3)(c).

KRS 625.090(3)(c) requires the family court to consider "whether the cabinet has, **prior to the filing of the petition** made reasonable efforts" to reunify the child with the parent if the child was placed with the Cabinet. (Emphasis added.)

Mother argues the Cabinet failed to make reasonable efforts because it failed to facilitate in-home drug testing despite the family court's ordering in-home drug testing in late January 2023. However, this written order for in-home drug testing was entered in the DNA case **after** the petition for termination of parental rights was filed. KRS 625.090(3)(c) directs the family court to consider whether the Cabinet had rendered reasonable efforts **prior** to the filing of the termination petition in determining the children's best interests. Therefore, the lack of in-home drug testing after the filing of the petition did not necessarily preclude a finding of reasonable efforts before the filing of the petition.

In addition to pointing to the lack of in-home drug testing, Mother also contends that Cabinet personnel focused only on her failings and not her successes, such as eventually obtaining sobriety and employment. She asserts the Cabinet unwisely focused on requesting further drug testing but failed to let the

-11-

family court know of other drug testing she had recently done. Despite Mother's criticism of the Cabinet, we discern no reversible error in the family court's determining the Cabinet made reasonable reunification efforts based on our review of the record and applicable law.

KRS 620.020(13) defines *reasonable efforts* as: "the exercise of ordinary diligence and care by the department to utilize all preventive and reunification services available to the community in accordance with the state plan for Public Law 96-272 which are necessary to enable the child to safely live at home."

The family court found the Cabinet offered case plans for reunification requiring substance abuse assessments and following recommendations therefrom; completion of random drug screens and parenting classes and establishing a safe, stable drug-free home. The family court concluded the Cabinet had rendered or attempted to render all reasonable reunification services and that no additional services would be likely to bring out lasting parental adjustment permitting a safe return of the children to Mother's home within a reasonable time, considering the children's ages.

The Cabinet's appellee brief points out Mother was unavailable for case planning conferences on some occasions, refused to case plan with the social worker at her home on one occasion, and refused to let the social worker enter her

home for an inspection at any point. The Cabinet also points to the social worker's prompt action to engage Mother in reunification services upon Mother's request in the fall of 2022. The Cabinet further cites precedent indicating evidence of the Cabinet's offering opportunities for a parent to participate in case planning and to attend visitation and therapy with the child or children is sufficient to support a finding of reasonable reunification services – especially when the parent does not always take advantage of such opportunities. *See Cabinet for Health and Family Services v. K.H.*, 423 S.W.3d 204, 212 (Ky. 2014).

Mother argues, however, the Cabinet did not do enough to help her, and the Cabinet and family court failed to properly consider her indigency and focused unduly on her past failings while failing to properly consider her recent progress. In support, she cites recent precedent including *M.E.C. v. Commonwealth, Cabinet for Health and Family Services*, 254 S.W.3d 846 (Ky. App. 2008); *F.V. v. Commonwealth Cabinet for Health and Family Services*, 567 S.W.3d 597 (Ky. App. 2018); and *K.D.H. v. Cabinet for Health and Family Services*, 630 S.W.3d 729 (Ky. App. 2021). However, these cases are all distinguishable in important respects, including the length of time between removal and the filing of the termination petition.

In the instant case, the Cabinet had continuously rendered or attempted to render reunification services for 19 months before filing the petition

for termination. And despite Mother claiming in her appellant brief that she was in two car accidents during the proceedings at issue and the house she owned was severely damaged by other people, the Cabinet points out that she came forward with no evidence of such car accidents or house damage at trial.

In contrast, in *M.E.C.*, the Cabinet had changed the goal to termination of parental rights and adoption just eight months after removal, with the parent having been hospitalized for car accident injuries or incarcerated for much of the same eight-month period. 254 S.W.3d at 852. Similarly, in *F.V.*, the petition for termination was filed only eight months after the child entered foster care and while the parent was in detention. 567 S.W.3d at 608. And in *K.D.H.*, the Cabinet asked to be relieved of its obligation to provide reunification services and sought a goal change to adoption less than a year after the child was adjudicated to be neglected and placed in the Cabinet's custody. 630 S.W.3d at 739-40.

Certainly, this Court has recognized, in our recent precedent, that a parent is not required to eradicate all problems immediately to avoid termination of parental rights. *See, e.g.*, *F.V.*, 567 S.W.3d at 609. But in contrast to the cited cases, the Cabinet came forward with evidence that it consistently provided or attempted to provide reunification services to Mother for well over a year prior to filing the petition for termination. Also, some evidence indicates Mother at times impeded the Cabinet's efforts to reunify, such as by not attending some case

-14-

planning conferences and by not allowing the social worker to discuss case plans with her at home or to inspect her home. The record does not compel a finding that the Cabinet did not make reasonable efforts to reunify or that Mother was not afforded "a fair opportunity to make changes which will allow [her] to regain custody of [her] children." *See K.D.H.*, 630 S.W.3d at 740.

In addition to differences in how long services were offered and how the parents responded to being offered services, the cases cited by Mother are distinguishable because they all hinged on KRS 625.090(2) grounds of parental unfitness which required findings of no reasonable expectation of improvement – which we discuss next.

In sum, we discern no reversible error in the family court's finding that the Cabinet made reasonable efforts to reunify Mother with the children based on the record before us and applicable law.

**Reasonable Expectation of Improvement Argument**

Within the same heading of her initial appellant brief argument about reasonable efforts, Mother also claims that the evidence shows a reasonable expectation of improvement. And in her reply brief, Mother argues the Cabinet must prove there is no reasonable expectation of improvement to terminate parental rights. However, only two KRS 625.090(2) grounds of parental unfitness require "no reasonable expectation of improvement . . . ." *See* KRS 625.090(2)(e)

(failure or inability to provide essential parental care and protection for at least six months); KRS 625.090(2)(g) (failure to provide necessities such as food, shelter, education and medical care for reasons other than poverty alone).

The Cabinet alleged both KRS 625.090(2)(e) grounds and KRS 625.090(2)(g) grounds in the petitions to terminate Mother's parental rights. However, the family court did not find KRS 625.090(2)(g) grounds, as it did not articulate a finding of continuous or repeated failure to provide necessities such as food, shelter, education, and medical care for reasons other than poverty alone. *See* KRS 625.090(2)(g).

In contrast, the family court did make a formal finding of KRS 625.090(2)(e) grounds in its written judgment. In its conclusions of law identifying which KRS 625.090(2) grounds existed, the family court stated both parents had, for at least six months, failed to or been incapable of providing essential parental care and protection with no reasonable expectation of improvement in that regard, considering the children's ages. *See* KRS 625.090(2)(e).

In addition to identifying KRS 625.090(2)(e) grounds, the family court also found KRS 625.090(2)(j) grounds – that both children had remained in foster care under the Cabinet's responsibility for 15 cumulative months of the 48-

month period preceding the filing of the termination petitions. Curiously, Mother's briefs do not discuss the family court's findings of KRS 625.090(2)(j) grounds.

Unlike KRS 625.090(2)(e) and (g), KRS 625.090(2)(j) does not require a finding of lack of reasonable expectation of improvement. And Mother has not disputed that both children had continuously remained in foster care under the Cabinet's responsibility since June 2021 – about 19 months before the petitions for termination were filed in January 2023.

This renders the family court's well-supported finding of KRS 625.090(2)(j) grounds a key distinction from precedent cited by Mother. Each case cited by Mother hinged on KRS 625.090(2)(e) and (g) grounds – and so required a finding of no reasonable expectation of improvement. *See M.E.C.*, 254 S.W.3d at 852-55; *F.V.*, 567 S.W.3d at 605-09; *K.D.H.*, 630 S.W.3d at 735-39.

The family court in *K.D.H.* considered KRS 625.090(2)(j) grounds despite a lack of allegation of these grounds in the petition, but we explained that the evidence there did not support a finding of the child remaining in foster care for fifteen months **preceding** the filing of the petition for termination. *Id*. at 740.[7] Here, in contrast, the Cabinet alleged KRS 625.090(2)(j) grounds in the petitions

---

[7] KRS 625.090(2)(a) grounds of abandonment had also been alleged and found in *K.D.H.*, although we discussed how the actions at issue did not meet the legal definition of abandonment established in binding precedent. 630 S.W.3d at 735, 739. Like KRS 625.090(2)(j), KRS 625.090(2)(a) does not require a finding of lack of reasonable expectation of improvement.

for termination and the family court made a valid finding that KRS 625.090(2)(j) grounds existed.

Since the family court made a valid finding of KRS 625.090(2)(j) grounds and KRS 625.090(2)(j) does not require a finding of no reasonable expectation of improvement, we need not address whether the family court erred in finding no reasonable expectation of improvement. It is not strictly necessary to prove more than one KRS 625.090(2) ground of parental fitness for a family court to terminate parental rights. *See* KRS 625.090(2) ("No termination of parental rights shall be ordered unless the Circuit Court also finds by clear and convincing evidence the existence of **one** (1) or more of the following grounds."). (Emphasis added.)

In sum, reversal is not merited based on a reasonable expectation of improvement given the family court's properly supported finding of KRS 625.090(2)(j) grounds. Next, we address Mother's argument the family court failed to properly consider her indigency.

## Indigency Argument

Mother asserts that the family court failed to properly consider her indigency when making its findings. Specifically, Mother takes issue with the family court's findings that, three years after removal, Mother did not have a safe and stable home where she could live with the children. She claims the house she

owned had been damaged by other people's vandalism and burst water pipes, but, as the Cabinet points out, Mother did not present any evidence about this house damage at trial.

Mother also takes issue with the family court's finding that, despite her having obtained full-time employment a few months prior to trial, Mother had not acquired "independent housing." Mother points out that independent housing was not a case plan requirement, and that Second Mile caseworker Jennifer Wilson testified it was difficult for Mother to afford a residence with sufficient bedrooms for the children given Mother's modest earnings.

Mother was living at Grandmother's house at the time of trial. Her appellant brief claims there was no evidence that this home was unstable or that the children could not live there. However, as the Cabinet points out, Mother admitted at trial that she would not permit the social worker to inspect Grandmother's home and that additional family members lived in the house until shortly before trial. The Cabinet also points to one of the family members living there, until shortly before trial, being the same sister who failed to provide supervision when the children were in her temporary custody. Also, despite Grandmother's testifying to being sober and employed and to welcoming the children to her home, Grandmother admitted to her own prior history of substance abuse and her incarceration for six weeks following termination from drug court.

Mother argues she lacked the financial means to rehabilitate the house she owns or to move to a new house. She contends the family court improperly used this lack of affluence as a reason to terminate her parental rights. We disagree.

While the case plan did not explicitly require independent housing and we agree that independent housing (meaning a residence solely for Mother and the children) was not necessarily required to provide a safe and stable home, the extraneous finding of lack of independent housing does not amount to reversible error. *See* CR 61.01. Aside from this extraneous finding regarding independent housing, the family court also found that, as of the time of trial, Mother had not achieved a safe and stable home for the children.

Despite the extraneous allusion to lack of independent housing, the family court's finding of the lack of a safe and stable home does not appear to be solely based on any inability to afford the purchase or rental of a separate home for her and the children. Instead, the finding reflects consideration of safety concerns not directly related to Mother's financial status. The family court specifically found Mother never allowed social workers to inspect where she lived, never submitted to random drug screens, and failed to make sufficient progress on her case plan to enable the safe return of the children to her. We construe the written judgment as focusing not on Mother's inability to afford to buy or rent a separate

-20-

home, but on her failure to demonstrate that she could provide a safe environment in the home based on factors not directly related to her financial status.

Furthermore, as discussed in the family court's findings of fact regarding Daughter, the surgeon testified to the importance of Daughter's having a caregiver with specialized training to meet Daughter's medical needs. Mother admitted she did not get this training. And while not explicitly discussed by the family court, the surgeon also testified to the importance of a home with hygienic conditions and a sober caregiver to provide proper care for Daughter's complex medical needs. A home inspection was imperative to ensure Daughter's medical needs could be met and both children would have a safe living environment in which the concerns posed by Mother's prior history of substance abuse had been addressed. The evidence of Mother's refusal to allow the social worker to inspect the residence and her lack of full compliance with case plan requirements such as random drug screens was substantial evidence supporting the family court's finding that Mother still could not provide a safe and stable home for the children nearly three years after their removal. This finding also clearly reflected the family court's assessment of whether Mother had made the efforts and adjustments to ensure the children's return home was in their best interests and occurred within a reasonable time, considering their ages. *See* KRS 625.090(3)(d).

Also, despite Mother's argument that *K.D.H.* mandates reversal for improper termination without proper consideration of indigency, we conclude *K.D.H.* is distinguishable. For example, as previously discussed, there was no valid finding of KRS 625.090(2)(j) grounds, based on the duration of foster care before the termination petition was filed, in *K.D.H.* Also, the termination in *K.D.H.* hinged on KRS 625.090(2)(e) and (g) grounds for which a finding of no reasonable expectation of improvement was required. Also, Mother points to no evidence about having to pay fees or travel great distances to obtain required services unlike the mother in *K.D.H. See* 630 S.W.3d at 734-38.

Also, in *K.D.H.*, we held there was no valid reason to require K.D.H. to establish an independent home away from K.D.H.'s grandparents since K.D.H.'s mother (with whom she had used drugs) had moved out of the home. *See id.* at 737. In contrast, substantial evidence supported the family court's implicit finding in this case that Mother's residence with Grandmother was not a safe and stable home for the children. As previously discussed, there was evidence of Grandmother's prior substance abuse and criminal history, and evidence of other family members' sharing the home until shortly before trial – including the same sister who failed to provide supervision when the children were in her temporary custody. Unlike *K.D.H.*, there is substantial evidence here of valid safety concerns

to support the family court's implicit finding that Grandmother's home was not a safe and stable home for the children.

In sum, we disagree with Mother's contentions that the family court failed to properly consider her indigency in making its findings and penalized her for not having the financial ability to purchase or rent a separate residence. Instead, the family court's finding that Mother did not have a safe and stable home was supported by substantial evidence of safety concerns not directly related to her financial status.

Next, we address Mother's allegation that her trial counsel was ineffective.

**Ineffective Assistance of Counsel Argument**

This Court recognized that ineffective assistance of counsel claims can be raised on direct appeal of termination of parental rights in *Z.T. v. M.T.*, 258 S.W.3d 31, 37 (Ky. App. 2008). We further recognized that due process and Kentucky law require that parental rights cannot be validly terminated unless the parent is represented by counsel at all critical stages of the proceeding, including all critical stages of underlying dependency, neglect, or abuse proceedings. *Id.* at 36 (citing KRS 625.080(3), KRS 620.100(1), and *R.V. v. Commonwealth, Dep't for Health and Family Services*, 242 S.W.3d 669, 673 (Ky. App. 2007)).

In *Z.T.*, we held we would consider claims of ineffective assistance of counsel in dependency or termination of parental rights cases only "if counsel's errors were so serious that it is apparent from the record that the parent was denied a fair and meaningful opportunity to be heard so that due process was denied." *Id.* at 36. We made clear that general allegations will not suffice to establish ineffective assistance of counsel. And we emphasized the standard for showing ineffective assistance of counsel in dependency or termination of parental rights proceedings is a very difficult one to meet. *Id.* at 37.

Mother, by appellate counsel, complains her trial counsel failed to effectively investigate her case or to present additional, allegedly readily available, evidence showing she had completed certain case plan requirements and had recent negative drug screens. Mother notes several statements in the written court record indicating she was working her case plan and obtaining services at New Hope and Second Mile. Yet she contends trial counsel failed to contact Morgan Lakes, her case manager at New Hope and Second Mile, to ask about case plan tasks completed at these agencies or to obtain evidence of compliance with certain case plan tasks such as parenting classes.

Mother asserts that she had negative test screens at New Hope and Second Mile which were not submitted into evidence. She complains that evidence of her completion of services at Second Mile and her Parenting Class

Certificate obtained there were not presented at trial – despite her appellate counsel's assertions that he easily obtained such documentation, and that Morgan Lakes was readily available on the phone and eager to attest to Mother's success.

In response, the Cabinet points out Mother was represented throughout the dependency, neglect, and abuse proceedings by an attorney who successfully sought several continuances on her behalf. The Cabinet also points out after the petition to terminate parental rights was filed, the family court granted Mother's request for appointed counsel – specifically, for a different attorney than in the DNA proceedings. It also points out that trial counsel filed an answer on Mother's behalf, cross-examined the witnesses called by the Cabinet, and called three witnesses on her behalf. The Cabinet also contends Mother's testimony corroborated the Cabinet's evidence in important respects and neither Mother nor Second Mile case manager Jennifer Wilson made any reference in their trial testimony to Morgan Lakes.

Mother asserts in her reply brief that Morgan Lakes would testify that Mother complied with all Cabinet requirements. Given the lack of indication that Morgan Lakes was employed by the Cabinet or had the authority to determine compliance on the Cabinet's behalf, this assertion strikes us as dubious. However, even assuming Morgan Lakes would testify to or provide documentary evidence of Mother having recently completed parenting classes or having submitted to drug

screens, Mother herself admitted to not having complied with all case plan requirements at the time of trial. Furthermore, even though Morgan Lakes might come forward with evidence of additional drug screens, social worker McClain admitted in her testimony that Mother had called in for random drug screens about 20 times during the year 2023 – albeit not nearly as often as Mother had agreed to do and with Mother calling in much more consistently only the last couple of months before trial.

Mother does not specifically allege Morgan Lakes would testify to her calling in for random drug screens more consistently or for a more extensive time than was indicated in McClain's testimony. And in her own trial testimony, Mother admitted she failed to comply with requirements to call in daily for random drug screens, asserting it was difficult to call in for drug screens due to her employment schedule. While Mother claims in her reply brief that she had completed random drug screens at both New Hope and Second Mile before trial, McClain admitted to receiving a couple of drug screens from Second Mile and to receiving about four drug screens in total, though only one or two screens were conducted on "required days" after calling in for random drug screens.

As for trial counsel's alleged failure to obtain readily available documentation of Mother's completing parenting classes, we recognize documentation of Mother's completing parenting classes would be some evidence

in her favor. However, the family court did not indicate lack of attendance at parenting classes was a key factor in its decision to terminate her parental rights. It did not even include a specific finding she failed to complete parenting classes in its written judgment. In contrast, the family court specifically found Mother never permitted the social worker to inspect her residence and never submitted to random drug screens. And while perhaps Morgan Lakes might have testified to Mother undergoing drug screens (possibly even random drug screens), she could **not** have testified to Mother allowing the social worker to inspect her residence – a key consideration in determining whether the children could safely return. Under these circumstances, the mere possibility of presenting additional favorable evidence does not merit relief on appeal for ineffective assistance of counsel.

Only rarely has any relief on appeal for ineffective assistance of counsel in termination of parental rights proceedings been granted in binding precedent – such as for an actual conflict of interest in an attorney representing both parents at trial under the facts of the case. *See T.W. v. Cabinet for Health and Family Services*, 484 S.W.3d 302, 306 (Ky. App. 2016). No such conflict of interest has been alleged here and different attorneys represented Mother and Father at trial.

While Morgan Lakes may have testified in Mother's favor if called and perhaps offered additional favorable documentary evidence, we conclude that

the difficult standard for proving ineffective assistance of counsel in this context has not been met. Based on our review of the record, any errors of her trial counsel were not so serious that Mother was deprived of a fair and meaningful opportunity to be heard or denied due process. *See Z.T.*, 258 S.W.3d at 36.

In sum, having carefully reviewed the record and applicable law, we discern no reversible error in the family court's judgment terminating Mother's parental rights. The family court's factual findings are supported by substantial evidence. Also, the family court made the requisite statutory findings by clear and convincing evidence, and it did not misapply the law. Furthermore, there was no abuse of discretion in its finding termination of Mother's parental rights to be in the children's best interests based on the record before us. Thus, we must affirm.

Further arguments in the parties' briefs which are not discussed herein have been determined to lack merit or relevancy in our resolving this appeal.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the Jackson Family Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

James O'Toole
Lexington, Kentucky

BRIEF FOR APPELLEE:

Juliana B. Coffey
London, Kentucky